Filed 8/25/22  In re N.R CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re N.R., a Person Coming Under the Juvenile Court Law. | B314339 |
| | (Los Angeles County Super. Ct. Nos. 21CCJP00240, 21CCJP00240A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| N.R., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Jean M. Nelson, Judge.  Dismissed.

Anne E. Fragasso, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Stephanie Jo Reagan, Deputy County Counsel, for Plaintiff and Respondent.

Appellant N.R. (mother) filed a notice of appeal challenging the juvenile court's jurisdictional findings concerning her daughter, whose initials are also N.R. (N.R.). After mother filed her opening brief, the juvenile court terminated dependency jurisdiction with an order granting mother sole legal and physical custody of N.R. The Los Angeles County Department of Children and Family Services (DCFS) contends these subsequent proceedings render mother's appeal moot. We agree and dismiss the appeal.

## BACKGROUND

### A. Referral and Initial Investigation

Mother was age 13 when these proceedings were initiated. She lived with her maternal grandmother and legal guardian, K.H., who also was the legal guardian of three of mother's half-siblings and was the adoptive parent of mother's maternal half-sibling O.R. In late 2020, DCFS received two referrals concerning K.H. While investigating those referrals,[1] a DCFS children's social worker (CSW) learned that mother recently had given birth to N.R. The social worker initiated a new referral regarding N.R., citing concerns about mother's maturity level and her recent involvement in physical altercations.

---

[1]     At least one of these referrals resulted in the filing of a dependency petition, which was heard concurrently with the petition filed in this case. We include here only information relevant to the petition filed in this case.

2

DCFS CSWs made an unannounced visit to the family's home to investigate the referral. Mother and K.H. separately reported they were unaware mother was pregnant until she went into labor, despite K.H. taking mother to the doctor after she complained of weight gain and missed menses. Mother and K.H. also both reported that mother's half-brother, O.R., age 15 at the time, was N.R.'s father (father); DNA testing later confirmed this. Mother disclosed that she and father had engaged in consensual sex while doing chores one day; she stated that was the only time she had engaged in sexual intercourse. K.H., who learned father's identity only after N.R.'s birth, reported that she had sent father to stay with a family friend and installed several cameras in the home. When asked about the "behavior problems" alleged by the reporting party, K.H. stated that mother had "a history of sexualized behaviors and running away/ditching," but had not had those problems since she had transferred to her current school. Mother denied experiencing abuse or engaging in self-harm, and said she felt safe living with K.H.

Mother had appropriate supplies for approximately one-month-old N.R., including formula, diapers, wipes, clothing, blankets, and a bassinet. Mother reported that she planned to continue attending school, where she was an above-average student; K.H. had agreed to care for N.R. while mother was at school and during the night. Mother said she had a therapist and was "still processing" N.R.'s birth. The CSW noted that mother "appeared to be very attentive" to N.R. during a feeding and diaper change, but needed assistance from K.H. to swaddle N.R. During a second visit, the CSW noted that mother was "appropriate" while holding and changing N.R., but did not talk

3

to N.R. and "quickly put the baby down and went on her computer."

A DCFS CSW visited father, who echoed mother's report of a one-time, consensual sexual encounter, explaining, "we were curious and dumb." Father did not know how N.R. was doing and "wasn't sure about being in the baby's life." Father denied abuse in K.H.'s home and opined that his siblings were safe in her care. He also denied substance use by anyone in the home, including himself. Father's caregiver reported that father was "a good kid" and was doing well in school.

A few weeks later, a CSW spoke with mother's therapist. The therapist had seen mother interact appropriately with N.R., but commented that mother "needs to learn how to hold the baby." She further reported that mother was "scared and confused" about becoming a parent, and was "in a traumatic state where she wants to be an adolescent but has very adult responsibilities." Mother's therapist also expressed concern for K.H., whom she described as "very overwhelmed."

During the investigation, a CSW spoke to mother and father's biological mother, S.R., from whom they had been removed years prior. S.R. stated she was concerned for her children and wanted them placed with her. A CSW also spoke to S.C., another of K.H.'s adult daughters. S.C. had last seen mother several months ago and did not know mother was pregnant at the time. S.C. reported that K.H. physically and emotionally abused mother, and expressed concern that K.H. "will torment [mother] so bad, that [mother] will hurt herself or the baby." S.C. also stated that father smoked marijuana.

At the conclusion of its initial investigation, DCFS concluded mother "is too young and immature to provide

4

adequate care" to N.R. It further expressed concern about the other referrals involving K.H., and opined that "this new situation will only cause [K.H.] to be more overwhelmed with having to care for the newborn who requires ongoing and constant attention." Citing the conversation with mother's therapist, as well S.C.'s remarks, DCFS also opined that mother's mental health and allegedly rocky relationship with K.H. could negatively affect mother's ability to care for N.R.

## B.    Petition and Initial Hearing

On January 19, 2021, DCFS filed a "non-detained" petition under Welfare and Institutions Code section 300, subdivision (b)(1).[2] In count b-1 of the petition, DCFS alleged that mother "has limited ability to provide the child with appropriate parental care and supervision due to the mother's behavioral issues. The mother's limited ability to provide appropriate care and supervision of the child endangers the child's physical health and safety and places the child at risk of serious physical harm, damage, and danger." In count b-2, DCFS alleged N.R. was at risk due to father's "behavioral issues and drug use."

At the January 22, 2021 initial hearing on the petition, the court found a prima facie case that N.R. was a child described by section 300. It further found, however, that reasonable services were available to prevent detention, and released N.R. to mother on the condition that mother continue living with K.H. The court ordered DCFS to provide appropriate referrals and make unannounced visits. It set the adjudication hearing for March 22, 2021.

---

[2]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

## C.    Jurisdiction/Disposition Report

DCFS filed a jurisdiction/disposition report on March 3, 2021.  The report documented interviews with several members of mother's family,[3] as well as observations by DCFS dependency investigators (DIs) and CSWs.

A DI visited mother and N.R. in K.H.'s home on February 19, 2021.  N.R. was doing well; the DI did not observe any marks or bruises.  Mother told the DI "she does her best to meet all of her baby's needs but does need help from [K.H.]."  Mother explained that K.H. cared for N.R. during the night, while mother slept.  K.H. separately told the DI that mother was "a great mom" who was "very responsible" and "does everything except giving the baby medication."  K.H. stated that father had not had much opportunity to be with N.R., but she thought both mother and father "would be able to take care of the baby."

Mother told the DI that she was doing well with K.H., and again denied abuse in the home.  Mother nevertheless thought it "would be a good change" for her and N.R. to live with maternal cousin E.S. instead.  Mother explained that she wanted to leave K.H.'s home so father could return there, and she also wanted "a bit more help with her baby."  Mother further stated that "sometimes [K.H.'s] expectations are too much," and "she just wants to be a child."  She clarified that K.H. "helps a lot with her baby but also holds her responsible for the baby's needs."  She added, "I just want to be free."[4]

---

[3]    Some of the interviews were conducted pursuant to orders in another case.  We summarize the interviews only to the extent they are relevant to the instant petition.

[4]    Mother and N.R. were placed with E.S. on February 24, 2021, less than a week after this interview.

When the DI asked mother about the allegations in the petition, mother said the b-1 allegation was "kind of true. I don't think I'm ready to be a mom. I still want to be a kid and go out with my friends. I have help from [K.H.] but still. I can't do it all on my own. I would need help with the baby but I want her to stay with me. If I am placed somewhere else, I want the baby to go with me. . . . [K.H.] helps but she puts a lot of the responsibility on me. If I go to [E.S.'s] house maybe she can help more with the baby. Alone I can't do it." With respect to the b-2 allegation, mother stated that father was "not ready to be a dad but will help me later on. He's a kid and wants to be a kid. I feel bad. I know he's also not ready to be a parent. But the thing is that at least he has a choice not to be with the baby now but I don't have that choice."

The DI met with father the following day. He told the DI that N.R. was fine with mother and should stay with her, but said the b-2 allegation was "true," because "I can't take care of the baby." Father opined that mother could take care of N.R. with the aid of K.H. Father denied any abuse by K.H.

DCFS recommended that the allegations of the petition be sustained. It opined that mother was "too young and immature to provide adequate care to the child." It pointed to mother and father's recent statements, as well the earlier statements from mother's therapist.

## D. Adjudication Hearing and Orders

The adjudication hearing was continued and held on July 19, 2021. The court admitted into evidence the reports summarized above. The court first addressed father's written motion to dismiss the petition pursuant to section 350, subdivision (c). Counsel for father and mother submitted on the

arguments contained in the motion, including a lack of evidence of immaturity, behavior problems or drug use; a lack of a nexus between any of those alleged issues and risk to N.R.; and a lack of current risk to N.R. N.R.'s counsel opposed the motion, arguing "it is clear that the adults in [mother's] life are necessary for her to be able to take care of this baby," and "if the court dismisses the petition, . . . [mother] could put [N.R.] wherever she wants." N.R.'s counsel asked the court to broadly construe the petition's allegation of "behavioral issues" to include "immaturity" and a lack of "cognitive ability to care for a child." Counsel for DCFS echoed this request, stating, "perhaps the Department was at a loss as far as what particular language" to use in the petition.

The court denied the motion. It stated that parents "themselves, are children, and so they are unable and unwilling to [care for N.R.] because of their youth, because of their developmental issues, because of their behavioral issues. And when I say 'issues,' I don't mean the problems, but they are very, very young and they are not capable. I'm not basing it simply on their age, either." The court clarified that it was not sustaining the petition at that point; it was finding only that DCFS "met [its?] initial burden."

The court then heard argument as to the petition. Mother's counsel argued that the petition should be dismissed. She asserted that the statements made by mother and her therapist earlier in the case were "stale," and that mother had demonstrated she was able to care for N.R. Counsel acknowledged that mother wanted to live with E.S. because she could receive more assistance there, and needed help providing N.R. with medication, but asserted that "seeking support" did not show that mother was unable to care for N.R. Counsel further

8

argued there was no current risk to N.R., as there was no evidence mother planned to leave E.S.'s home or stop caring for N.R.

Father's counsel said he agreed with mother's counsel's statements. He emphasized that mother always had appropriate supplies for N.R. and was observed appropriately caring for her. He further argued that no safety issues had arisen during the pendency of the petition, despite mother's "struggle[ ] to accept her role as a parent and responsibilities," and "[a]ll the evidence shows that mother is indeed able to care for this child appropriately." As to the b-2 count, father's counsel incorporated the arguments from the motion to dismiss. He additionally argued that "[t]his is not a petition that needs to be sustained in order to protect the child," as father resided in a separate home, was not seeking custody, and posed no danger to N.R.

After hearing these arguments, the court said its tentative ruling was to sustain the petition. Counsel for N.R. and DCFS submitted on the tentative ruling.

The court amended both counts of the petition to allege parental "behavioral issues and emotional immaturity," and sustained the petition as amended. The court explained, "it is completely understandable" and age-appropriate for parents to express "deep concern about their ability and willingness to be the parents that such a young child needs . . . . That doesn't mean these parents don't love the baby. These are young parents who are confronted with having to be adults essentially, and they are not adults yet, and they haven't developed the maturity. Regardless of their actual age, they are clearly showing they don't yet have the maturity and ability to step forward as parents yet. That doesn't make them bad people; that doesn't mean that

9

they are somehow lagged behind in terms of maturity; they are simply saying something that is consistent very much with their age. [¶] But as a second point, the way this pregnancy came about shows that there are some judgment problems that puts [*sic*] the child at risk, and with services and such, parents will learn more about those issues . . . . But that incident shows that the judgment is not fully developed in these children, and it is a type of judgment that is necessary in raising a child."

The court proceeded to disposition. It declared N.R. a dependent and removed her from father "based on the fact that he is not seeking custody." However, it concluded there was not clear and convincing evidence supporting removal from mother. It therefore ordered N.R. to remain in mother's care "so long as she continues to comply with the Department['s] supervision of her, including where she chooses to live." The court ordered mother to complete a parenting class for teen mothers, to participate in individual counseling to address case issues, and to participate in family preservation services.

## E. Appeal and Post-Appeal Developments

Mother timely appealed. After mother filed her opening brief arguing there was no current risk to N.R., DCFS filed a request for judicial notice of subsequent juvenile court orders. We granted the request, taking judicial notice of a February 25, 2022 order terminating jurisdiction and awarding sole legal and physical custody to mother, and a March 4, 2022 order indicating that a juvenile custody order effectuating the February 25, 2022 order had been filed.

## DISCUSSION

DCFS argues that the appeal is moot because the court has terminated jurisdiction over N.R. and returned her to mother's

10

custody, and therefore we can grant mother no effective relief. "When no effective relief can be granted, an appeal is moot and will be dismissed." (*In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1315; see also *In re N.S.* (2016) 245 Cal.App.4th 53, 58-61.) However, we retain "inherent discretion to resolve an issue when there remain 'material questions for the court's determination' [citation], where a 'pending case poses an issue of broad public interest that is likely to recur' [citation], or where 'there is a likelihood of recurrence of the controversy between the same parties or others.' [Citation.]" (*In re N.S.*, *supra*, 245 Cal.App.4th at p. 59.)

Mother acknowledges that N.R. has been returned to her care. She nevertheless urges us to exercise our discretion to consider her appeal on the merits because the jurisdictional finding "may well be stigmatizing, both personally and professionally, as mother, a good student, explores educational and employment opportunities," and mother "has a right to clear her name." We decline. With jurisdiction terminated and N.R. returned to mother's sole legal and physical custody, there is no effective relief we could grant.

"[W]e understand the desire of parents to challenge negative findings made about their parenting in dependency proceedings even when they are ultimately able to regain custody of their children." (*In re N.S.*, *supra*, 245 Cal.App.4th at p. 62.) However, mother has not shown any adverse effect from the jurisdictional findings, which are not of the type that would subject her to inclusion on the Child Abuse Central Index. (See *In re Emily L.* (2021) 73 Cal.App.5th 1, 14-15.) To the extent the court's findings here may be construed as negative, we note that juvenile proceedings are confidential. In the event the facts may

11

be disclosed in future dependency proceedings, so too would the facts that N.R. always remained in mother's care, and mother took prompt and positive steps to remediate the concerns that led to the petition.  We accordingly decline to exercise our discretion to review the findings.

## DISPOSITION

The appeal is dismissed as moot.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


MANELLA, P. J.


WILLHITE, J.